IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

SANDRA QUESNOY,

                Plaintiff,                          3:10-cv-1538-ST

        v.                                OPINION AND ORDER

STATE OF OREGON, DEPARTMENT OF
CORRECTIONS; CAPTAIN HEPLER, in his
individual capacity; MARY RAINES, in
her individual capacity; and ELIZABETH SUZANNE
SAZIE, M.D., in her individual capacity,

                Defendants.

———————————————————————

STEWART, Magistrate Judge:

      Plaintiff, Sandra Quesnoy ("Quesnoy"), a former inmate at Coffee Creek Correctional

Facility ("CCCF"), filed this complaint against the State of Oregon, Department of Corrections

("ODOC") and three CCCF employees in their individual capacities:  Captain James Hepler (a

corrections officer), Mary Raines (a nurse), and Elizabeth Suzanne Sazie, M.D.  Quesnoy alleges

1 OPINION AND ORDER

claims against the individual defendants under 42 USC § 1983 for violating her First, Eighth, and

Fourteenth Amendment rights and a claim under state law for intentional infliction of emotional

distress.  She alleges that ODOC violated the Americans with Disabilities Act ("ADA"), 42 USC

§ 1201, *et seq*., and the parallel state law, ORS 659A.142.

The court has jurisdiction under 42 USC § 1331 over the federal claims and under

42 USC § 1367 for state law claims arising out of the same case or controversy.  All parties have

consented to allow a Magistrate Judge to enter final orders and judgment in this case in

accordance with FRCP 73 and 28 USC § 636(c) (docket # 13).

Quesnoy has filed a Motion for Partial Summary Judgment on her Fifth and Sixth Claims

for violations of the ADA and ORS 659A.142 (docket # 28), and defendants have filed a Motion

for Summary Judgment on all claims (docket # 29).  For the reasons set forth below, Quesnoy's

motion is denied and defendants' motion is granted in part and denied in part.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only determine[] whether there is a genuine issue for trial."  *Balint v. Carson City*, 180 F3d 1047,

1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely

colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).  The substantive law governing a claim or defense determines whether a fact is material.  *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted).  The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party."  *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986).

## UNDISPUTED FACTS

Quesnoy was an inmate at CCCF from March 19, 2009, through May 25, 2010.  Quesnoy Depo., p. 2.[1]  She did not like prison and thought her treatment was inhumane. Quesnoy Depo., pp. 26-27.  In particular, she disliked the food, bedding, medical care and attitude of the staff. *Id*, pp. 27-31.

Quesnoy entered CCCF with leg, neck and back pain injuries, including cervical myelopathy and cervical stenosis.  Quesnoy Decl., ¶ 2.  As a result, she experiences instability, gait ataxia, weakness, spasticity, and significant pain and discomfort which are controlled by medications.  *Id*, ¶¶ 3-4, 6.  Her injuries impact her ability to walk, stand, move, dress herself, use the toilet and sleep and require her to use a walker and wheelchair.  *Id*.  Because her injuries make lying down and sleeping extremely painful, she needs a pillow to support her head and neck.  *Id*, ¶ 4.  She also requires eyeglasses to read.  *Id*, ¶ 5.  Due to her disabilities, Quesnoy was assigned to an ADA-compliant cell and provided a caregiver to assist her.  Wong Decl., ¶ 3;

---

[1]   The parties have submitted documents with various attachments.  Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration or to the page(s) of the deposition transcript.

Quesnoy Depo., p. 32.  She provided a medical history to CCCF staff documenting that she had

kidney and bladder problems and trouble urinating.  Quesnoy Decl., ¶ 8, Ex. A, p. 12.

Due to an infection, Quesnoy was taken first to the infirmary at CCCF and, as a result,

did not undergo the normal intake process afforded other inmates.  *Id,* ¶ 11.  She was not

oriented as to the prison rules, policies, or procedures, including the grievance procedures.  *Id.*

While in the infirmary, she reported her physical difficulties to medical staff and was given a

medication to help her void.  *Id,* Ex. B, pp. 13-15.  On March 21, 2011, she also requested a

walker to help her walk which was denied.  *Id,* p. 16.  On April 2, 2009, CCCF's progress notes

state that a "shy bladder [is the] likely cause" of her symptoms.  Sazie Decl., Ex. 1, p. 63.  She

was released to the general population on April 3, 2009, when she received the use of a walker.

*Id,* pp. 62, 121; Quesnoy Decl., Ex. A., p. 9.

On May 13, 2009, Quesnoy was ordered to provide a urine sample.  Quesnoy Decl., ¶ 10;

Ward Decl., Ex. 1.  She failed to produce a sample after being given the requisite amount of

water over a two-hour period.  Ward Decl., Ex. 1.  As a result, she was charged with violating

Rules 1D(e) (Contraband) and 4A(Disobedience of an Order I) and taken to CCCF's

Disciplinary Segregation Unit ("DSU").  *Id.*  In the DSU, Quesnoy was housed in DS101, an

ADA-compliant cell.  Second Wong Decl., ¶ 2.  Her personal property was taken from her,

including her walker, eyeglasses, and additional pillow.  Quesnoy Decl., ¶ 11.

While in the DSU, Quesnoy received information about her disciplinary hearing

scheduled for May 19, 2009. but she could not read the small print without her eyeglasses.  *Id,*

¶ 12. On May 13, 2009, Quesnoy wrote a kyte to Raines, CCCF's Health Services Manager,

requesting that medical information about her inability to urinate be provided at her disciplinary

hearing.  *Id*, ¶ 12 & Ex. E.  Raines responded that "this is not something we can do."  *Id.*  Also before the hearing, Katrina Drury, , the Sergeant at Arms for Hearings, emailed Raines requesting information on whether Quesnoy had a medical reason for failing to provide a urine sample within the allotted time.  Raines checked the file and reported back to Drury that she found no notation of a medical reason.  Raines Depo., pp. 30-31; Oldham Decl., Ex. C, p. 4.

On May 19, 2009, Hearings Officer Pete Sturdevant presided over a hearing on Quesnoy's disciplinary violations.  Sturdevant Decl., ¶ 3.  He noted in his decision that Quesnoy received a copy of the Misconduct Report, Notice of Hearing, Notice of Inmate Rights in a Hearing and Rules of Prohibited Conduct, and acknowledged understanding of the Misconduct Report and Notice of Inmate Rights.  *Id,* Ex. 1, p. 1.  At the hearing, Quesnoy presented no evidence, was very emotional, said very little, stated that she had been sick for many years, could not "pee on command," and did not comment on what she thought her sanction should be.  *Id*, ¶ 5; Quesnoy Decl., ¶ 12.

Sturdevant determined that the charge of Rule 4A was "not supported by the facts" and instead found that she violated "the lesser include major rule violation of Rule 4[B], Disobedience of an Order II."  Sturdevant Decl., Ex. 1, p. 2.  He also found that Quesnoy had violated Rule 1D(e) (Contraband).  *Id.*  The Contraband violation is on Level 2 of the Major Violation Grid which dictates the appropriate sanction absent special circumstances.  *Id*, ¶ 7.  Because he found no special circumstances, Sturdevant issued the following "routine" sanction: 365 days of basic visitation, 28 days in the DSU, 14 days loss of privileges, and a $50 fine.  *Id*, ¶ 7 & Ex.1, p. 1.  Basic visitation is conducted through Plexiglas with no physical contact between the inmate and family members. *Id*, ¶ 8; Quesnoy Decl., ¶ 13.  By ODOC rule, a major

disciplinary violation results in a loss of "good time" which can delay a release date.  Sturdevant Decl., ¶ 7.  Quesnoy's release date was delayed 20 days as a result of her disciplinary violation.

While in the DSU from May 13 to June 9, 2009, Quesnoy did not have the means to move around her cell, was not allowed out for exercise, and developed bedsores from lying in her bed.  Quesnoy Decl., ¶ 11.  She requested the use of walker from the triage nurse which was denied. *Id*.  She sent multiple kytes requesting a walker, as well as her eyeglasses and pillow, throughout her stay in the DSU.  *Id*, Ex. F.  She also sent kytes to Captain Teal on May 21, 2009, and to Superintendent Howton on June 1, 2009, appealing the decision to the Office of the Inspector General.  *Id*, ¶ 15.  Her neurologist, Dan Friedman, M.D., also submitted a letter dated July 9, 2009, explaining that she had a condition which may create problems voiding.  *Id,* Ex. F, p. 27.  Her sister (Debbie Davis) and her husband (Gary Quesnoy) also submitted letters in July 2009 and August 2009 to the Office of the Inspector General.  *Id*, ¶ 6; Davis Decl., ¶ 6; Gary Quesnoy Decl., ¶ 6, & Ex. A.

During her stay in DSU, Quesnoy's family called frequently to lobby on her behalf.  On May 28, 2009, Hepler met with Quesnoy after one of the calls.  Quesnoy Decl., ¶ 14.  Hepler was angry and told Quesnoy that her husband had been informed not to call and advocate for her needs.  *Id*.  He also told her it was inappropriate for anyone to advocate on her behalf when she was in prison and made belittling comments about her marriage.  *Id*.  The conversation frightened Quesnoy and made her hysterical.  Quesnoy Depo., p. 97.  A mental health counselor was called to help her.  *Id*.

Quesnoy was treated multiple times a month by CCCF medical staff.  Sazie Decl., ¶ 5. According to Dr. Sazie, CCCF's Chief Medical Officer, a number of different drugs were used to

try to manage Quesnoy's chronic pain.  *Id*, ¶¶ 3-4.  She initially received Morphine Sulphate

Extended Release ("MS") at 15 mg, twice a day (Sazie Decl., Ex. 1, p. 126) which was

discontinued on March 27, 2009 (*id* at 68), but restarted on April 15, 2009 at 15 mg in the

morning and at noon, and 30 mg at bedtime (*id* at 57).  This was increased on June 16, 2009 (*id*

at 116) to 30 mg in the morning, 15 mg at noon, and 30 mg at bedtime, but then decreased on

January 14, 2010 to 15 mg in the morning, 15 mg at noon, and 30 mg at bedtime (*id* at 104).  The

MS was discontinued on February 3, 2010, and replaced with Ultram (Tramadol) until

Quesnoy's release.  *Id,* pp. 95, 97-98, 100-02.  During her incarceration, *s*he was prescribed other

pain medications as well (Roxicet, Neurontin, and Baclofen).  *Id*, pp. 104, 111, 116-18, 127.

On September 8, 2009, Quesnoy provided a urine sample within the normal two-hour

window.  Quesnoy Decl., ¶ 22.  However, on January 27, 2010, she was unable to provide a

sample within two hours, but succeeded after staff gave her additional time.  *Id.*

In February 2010, when Quesnoy was given Tramadol to control her pain, she was also

given another medication (Clonazepam) for muscle relaxation.  Sazie Decl., ¶ 4.  The

combination, however, caused her to become somnolent.  *Id.*  The muscle relaxant was then

stopped.  *Id.*

Quesnoy's attorney filed two separate Oregon Tort Claims Notices on December 9, 2009,

and February 10, 2010.  Quesnoy Decl., Ex. H.  Raines investigated the notices on behalf of

CCCF and reported to Dwayne Green of Risk Management that there was no medical reason that

Quesnoy should not be able to timely produce a urine specimen.  Oldham Decl., Ex. C., pp. 4, 6.

Quesnoy completed her sentence and was released from CCCF on May 25, 2010.

Oldham Decl., Ex. 8.

7 - OPINION AND ORDER

## DISCUSSION

### I. Intentional Infliction of Emotional Distress (Seventh Claim)

Quesnoy asserts an intentional infliction of emotional distress claim under Oregon law seeking noneconomic damages for her emotional distress, pain, distress, fear, anxiety, humiliation, discomfort, and loss of enjoyment.  However, under ORS 30.650, "[n]oneconomic damages . . . may not be awarded to an inmate in an action against a public body unless the inmate has established that the inmate suffered economic damages."  Although Quesnoy is no longer an inmate, she was an inmate at all times during which she allegedly suffered emotional distress.  However, she neither alleges nor submits any evidence that she suffered any economic damages.  Thus, defendants' motion to dismiss this claim is granted.

### II. Disability Discrimination Claims (Fifth and Sixth Claims)

Quesnoy's disability discrimination claims against ODOC are premised on her inability to urinate and how she was treated when she was unable to produce a sample.  Both parties move for summary judgment on those claims. The dispute primarily centers on whether Quesnoy is disabled under either the ADA or ORS 659A.  If so, the issue becomes whether she was denied the reasonable accommodation of being listed on the medical status report which, pursuant to OAR 291-042-0015, would give her additional time to produce a urine sample.

#### A. Legal Standards

Title II of the ADA prohibits discrimination against disabled persons by any public entity.  42 USC § 12132.  A public entity includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 USC § 12313(1). CCCF is clearly a "public entity" as defined by the ADA.

If appropriate, a public entity must make "reasonable accommodations" in order to ensure that an individual's disability does not prevent her from enjoying the benefits provided by a public entity. 42 USC § 12132. In order to state a claim of disability discrimination under Title II, a plaintiff must prove four elements:

> (1) [s]he is an individual with a disability; (2) [s]he is otherwise qualified to participate in or receive the benefit of some publics entity's services, programs, or activities; (3) [s]he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of [her] disability.

*McGary v. City of Portland*, 386 F3d 1259, 1265 (9th Cir 2004) (quotations and citations omitted).

Under the implementing regulations, the ADA applies to the programs, services and activities of a public entity, including a jail. *See Pierce v. Gates*, 526 F3d 1190, 1214 (9th Cir 2008) (applying Title II of the ADA to the Orange County Jails' services, programs and activities for detainees), citing *Pennsylvania Dep't of Corr. v. Yeskey*, 524 US 206, 209-210 (1998); *Lee v. City of Los Angeles*, 250 F3d 668, 691 (9th Cir 2001).

The Oregon Legislature also has enacted several provisions protecting disabled individuals from discriminatory conduct. *See* ORS 659A.103-.145. In particular, ORS 659A.142 bars discrimination against disabled persons by an employment agency, a labor organization, a place of public accommodation, or state governments. ORS 659A.142(5)(c), which bars discrimination by state governments, is similar to the federal ADA regulation relating to government accommodations and balances a requested accommodation against any

9 - OPINION AND ORDER

fundamental change in the nature of the program that may result.  *See e.g*. *Pierce*, 526 F3d at 1215, citing 28 CFR § 35.150(a).

### B.  **Quesnoy's Disability**

To advance her disability discrimination claims, Quesnoy must show that she was a "qualified individual with a disability."  To do so, she must establish that she has:  (1) a physical or mental impairment that substantially limits one or more of her major life activities; (2) a record of the impairment; or (3) is regarded as having an impairment.  42 USC § 2102(2)(A); ORS 659A.400(1).  That a person has a medical condition, even one that affects his or her choice and range of activities, does not make that person disabled without a showing that the condition restricts a "major life activity."  *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 US 184, 202 (2002).  Whether a claimed medical condition meets the ADA's standard of "disability" must be evaluated in the context of how the condition affects the individual plaintiff.  *Id* at 198.

Based on the records maintained by CCCF, a genuine issue of material fact exists as to whether Quesnoy has "a physical or mental impairment that substantially limits one or more of [her] major life activities."  Quesnoy clearly has a number of physical impairments. The issue is whether those impairments, or more particularly the medications she takes as a result of those impairments, cause her difficulty in producing a urine sample within two hours.

On March 27, 2009, shortly after she entered the infirmary, Quesnoy informed the medical staff of her trouble voiding.  Quesnoy Decl., Ex. B., p. 15.  The staff changed her medication by taking her off MS and giving her Oxycontin instead.  *Id*.  However, upon leaving the infirmary on April 15, 2009, and entering the general population, the staff changed her prescription again, putting her back on MS.  *Id*, p. 13.  Raines acknowledged that MS was known

to cause potential problems voiding.  Raines Depo., pp. 31-32.  However, she did not report this

side effect either before or after Quesnoy's disciplinary hearing.  *Id.*

Quesnoy also was prescribed a diuretic (Lasix[2]) as early as July 21, 2009.  Quesnoy

Decl., Ex. B., p. 17.  Although the record is unclear as to why it was prescribed, the need for a

diuretic lends credence to her complaint that the medical staff knew of her problem voiding.

Quesnoy's neurologist, Dan Friedman, M.D., later confirmed that she may have a

problem voiding due to her physical impairments.  On July 9, 2009, he submitted a letter

explaining "she has a history of cervical spinal cord injury and is on medications that can

contribute to difficulty emptying her bladder.  At prior visits we have never specifically

discussed bladder function.  . . . It is certainly probable that any spinal cord injury could produce

difficulty with bladder function."  *Id,* Ex. G.  While Dr. Friedman admits they had not discussed

bladder function prior to incarceration, Quesnoy explains that he was not aware that her

medications were altered upon incarceration and of her full medical needs.

Finally, Quesnoy points out that when given additional time to produce a urine sample on

January 27, 2010, she was successful.  Quesnoy Decl., ¶ 22.

ODOC argues Quesnoy has shown only that she has impairments, not a disability.  A

person's diminished ability is not the same as "substantially limited."  *Thornton v. McClatchy*

*Newspapers, Inc.*, 292 F3d 1045, 1046 (9th Cir 2002) (though plaintiff's life has been diminished

by her inability to engage in continuous keyboarding, "diminished is different from 'substantially

limited'").  Quesnoy's situation is distinguishable, however, because her impairments consist of

---

[2]  "Lasix is a loop diuretic (water pill) that prevents your body from absorbing too much salt, allowing the salt to
instead be passed in your urine.  Lasix treats fluid retention (edema) in people with congestive heart failure, liver
disease, or a kidney disorder such as nephrotic syndrome. This medication is also used to treat high blood pressure
(hypertension)."  Drugs.com, http://www.drugs.com/lasix.html . (last visited October 27, 2011).

substantially limited mobility and bodily functions.  Her diminished ability to void is a side effect of the medications taken as a result of those impairments.

ODOC points out that other courts have found that difficulty urinating is not a disability, citing *Oyague v. State*, 2000 WL 1231406 (SDNY 2000).  However, that case is distinguishable because it only evaluated whether difficulty urinating was enough to satisfy the definition of disability.  Quesnoy's inability to urinate is related to the medications she takes due to her spinal condition and limited mobility.

ODOC also contests each piece of evidence relied on by Quesnoy to establish a causal connection between her physical impairments and an inability to produce a urine sample within two hours.  After being advised of her medical condition, CCCF medical staff characterized her problem as only a "shy bladder;"  Dr. Friedman refers only to a probability, not a medical certainty; the Lasix could have been prescribed for any number of reasons; and Quesnoy did produce one urine sample within two hours.  At this point, the evidence is sufficiently disputed as to Quesnoy's status as a disabled individual that both motions for summary judgment on the disability discrimination claims are denied.

## III. <u>Constitutional Claims (First, Second, Third, and Fourth Claims)</u>

Quesnoy alleges that Hepler, Raines, and Dr. Sazie are liable under 42 USC § 1983 for violating her constitutional rights.  A plaintiff may bring an action under § 1983 to redress violations of her "rights, privileges, or immunities secured by the Constitution and [federal] laws" by a person or entity, including a municipality, acting under the color of state law.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 US 658, 690-95 (1978).  Defendants seek

summary judgment as to all § 1983 claims on the ground that they violated no constitutional

right and are entitled to qualified immunity.

### A. **First Amendment (First Claim)**

Quesnoy alleges that she and her family exercised their right to protest her treatment

about lack of appropriate medical care, her placement in DSU, the denial of use of her walker,

eyeglasses, and pillow while in the DSU, and her loss of good time credits.  Complaint, ¶ 28.

She also exercised her right to petition by filing claims under the OTCA, ORS 30.275.  As a

result of expressing these rights, she alleges that she suffered the following adverse actions:  a

denial of "appropriate medical care" and "access to medications to manage pain," "changing her

medications without cause and putting her on Tramadol," emotional distress from her

confrontation with Hepler, a refusal to remove the additional 20 days from her sentence and the

loss of visitation privileges.  *Id*, ¶ 29.  Based on the arguments presented by Quesnoy, this court

construes her allegation regarding her lack of "appropriate medical care" and "access to

medications to manage pain" as based on the decrease in dosage of MS and the eventual change

to Tramadol.

Within a prison context, a viable claim of First Amendment retaliation requires proof that

a state actor took some adverse action against an inmate because of that inmate's protected

conduct, and that such action chilled the inmate's exercise of her First Amendment rights and did

not reasonably advance a legitimate correctional goal.  *Rhodes v. Robinson*, 408 F3d 559, 567-68

(9th Cir 2005).  *See also Barnett v. Centoni*, 31 F3d 813, 815-16 (9th Cir 1994) (per curiam).  "A

plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some

other harm." *Brodheim v. Cry*, 584 F3d 1262, 1269 (9th Cir 2009), citing *Rhodes*, 408 F3d at 568 n11.

### 1. <u>Pain Medication</u>

Quesnoy first asserts that Dr. Sazie, Raines, and Hepler retaliated against her by changing her pain medication prescription after she exercised her First Amendment rights.  Her dosage of MS was reduced, causing withdrawal symptoms, and she was given Tramadol, which caused a an adverse drug interaction with another medication.  Since Hepler was not involved in changing Quesnoy's medications, he is entitled to summary judgment as to this allegation.

Raines and Dr. Sazie contend that they simply followed CCCF's policy which is to:

> (a) Provide essential and important healthcare services that support the health status of inmates during incarceration, including end of life care.
> (b) Deliver constitutionally mandated healthcare using an efficient managed care system in support of the mission of the department.
> (c) Ensure there is an organized system in place to provide inmates with access to care to meet their serious medical, dental, and mental health needs.

OAR 291-124-0005(3)(a)-(c).

While incarcerated at CCCF, Quesnoy was given medications to manage her chronic pain, though it was not the same opiate medication she requested or received prior to incarceration.  Sazie Decl., ¶¶ 3, 5.  On March 20, 2009, she was prescribed 15 mg of MS, twice daily.  *Id*, Ex. 1, p. 126.  This was discontinued on March 27 (*id*, p. 68), but resumed on April 15 with an increased dosage  (*id,* p. 57) which was increased again on June 19, 2009.  *Id*, p. 116.  In December 2009, someone in CCCF consulted a "Dr. Becker" about Quesnoy's care.  *Id*, ¶ 3 & Ex. 1, pp. 106.  On December 22, 2009, Dr. Becker orally suggested decreasing her narcotics medication.  *Id*, Ex. 1, p. 31.  Quesnoy's MS prescription was then reduced on January 14, 2010.

14 - OPINION AND ORDER

*Id*, p. 104.  On January 25, 2010, Quesnoy expressed her skepticism as to this reduction because upon her release she would resume her previous dosages of MS.  *Id*, p. 28.  She also refused to sign a release or her records to Dr. Becker for further review.  *Id*.  On February 2, 2010, she was prescribed 30 mg of MS once a day and transitioned to Ultram.  *Id*, pp. 102-03.

The change in medication did not go well for Quesnoy:  "They took it away cold turkey so I was withdrawing from it."  Quesnoy Depo., p. 123.  She asked Dr. Sazie about the change, explaining that she had been on the medication since her spinal surgery and that nothing had changed.  *Id*, p. 117.  Dr. Sazie responded by saying she "should feel lucky to be off the medication and onto something that wasn't a narcotic."  *Id*.  Quesnoy also asked Janet Lee Ridgeley, L.N.P., about her change.  *Id*, p. 118.  Ridgeley responded that the change had come from Dr. Sazie and Raines.  *Id*, pp. 118-19.

Quesnoy filed written complaints about her conditions in the DSU beginning in May 2009 and appealed the disciplinary hearing decision to Captain Teal and Superintendent Howton on May 21 and June 1, 2009, respectively   Quesnoy Decl., Ex. F., pp. 1, 4.  On December 4, 2009, her attorney filed an Oregon Tort Claims Act Notice about her treatment.  Jana Wong, the Supervising Executive Assistant to the Superintendent, and Raines learned about this notice on December 11, 2009.  Oldham Decl., Ex. C, pp. 9, 23.  The consultation with Dr. Becker about her medication and the reduction of the MS or weaning off of the narcotics occurred shortly after the December 2009 OTCA notice.  This timing is sufficient to create an a factual issue as to causation for the alleged retaliation.  Although defendants have shown that Dr. Becker suggested decreasing the narcotics medications, they do not explain why he was not consulted earlier in time, but only after Quesnoy's complained, and whether he was fully aware of Quesnoy's

medical history.  Thus, a genuine issue of material fact exists as to the involvement by Dr. Sazie

and Raines in changing Quesnoy's medications which caused withdrawal symptoms and

inadequate pain management.

With respect to the prescription of Tramadol in January 2010, Dr. Sazie explains that it

was part of an effort to provide appropriate treatment:

> In February 2010, while still working with her on appropriate pain
> treatment, she was given Ultram (Tramadol).  Klonopin (Clonazepam)
> was added for muscle relaxation. She became somnolent on this
> combination of mediations.  The muscle relaxant Klonopin was stopped.
> The combination of Ultram and Klonopin was not prescribed to punish or
> "get back" at Quesnoy.  Such would be a violation of my ethical
> obligations as a physician.  I would never do such a thing nor allow it
> under my supervision.

Sazie Decl., ¶ 4.

Quesnoy has presented no evidence that either Dr. Sazie or Raines knew in advance that

she would suffer an adverse reaction due to this combination of medications.  Thus, they are

entitled to summary judgment as to this allegation.

### 2. <u>Personal Health Items</u>

Quesnoy did not have access to her walker, eyeglasses, or pillow while in the DSU.

Quesnoy Decl., ¶ 11.  She requested these personal health items on multiple occasions from the

triage nurse and Hepler, and her family contacted CCCF with similar requests.  *Id*, ¶¶ 4, 11 &

Ex. C, pp. 1, 7; Davis Decl., ¶¶ 2, 4-5; Gary Quesnoy Decl., ¶ 4.  The progress notes also reflect

these requests.  Quesnoy Decl., Ex. B., p. 11 (5/18/09 complaint by Quesnoy's sister); Sazie

Decl., Ex. 1, p. 50 (same).  Her pillow was returned halfway through her period at the DSU.

Quesnoy Decl., ¶ 11.  However, Quesnoy did not receive her walker until a week after she left

DSU.  Sazie Decl., Ex. 1, p. 47.

There is no dispute that inmates housed in the DSU may have their personal health items.

OAR 291-011-0050(7) ("Disciplinary-segregated inmates will be permitted to retain basic

personal health items (i.e., dentures, prescribed glasses, hearing aids.").  If an inmate has a

medical complaint, "the staff member receiving the complaint will notify the disciplinary

segregation supervisor who will make the request for the service to the appropriate section in a

timely manner" and document the request in the inmate's record.  OAR 291-011-0060(5)(c).

According to Hepler, while inmates are not allowed to bring items with them on the first day in

the DSU, if they need something medically and "medical agrees," that property will be issued to

them.  Hepler Depo., p. 29.  Raines concedes that it would be a deviation of standard practice if

Quesnoy were not provided with her wheeled walker during the time she was in DSU.  Raines

Depo., p. 55.

Quesnoy blames Dr. Sazie for pushing her not to use a walker or wheelchair because

Dr. Sazie believed there was nothing wrong with her.  Quesnoy Depo., p. 31.  Dr. Sazie does not

specifically respond to that charge, other than to state that medical staff tried to get Quesnoy to

be more active and reduce her dependency on opiates for pain control.   Sazie Decl., ¶ 3.  That

effort might result in urging Quesnoy to reduce her use of mobility devices.  The record reveals

that a nurse was contacted in response to a complaint by Quesnoy's sister regarding the walker.

Quesnoy Decl., Ex. B, p. 11.  However, nothing in the record reveals that such a request was

made to either Dr. Sazie or Raines.  Absent some evidence that they were aware of, and either

ignored or refused, the requests for a walker in the DSU, then they cannot be liable for retaliating

against Quesnoy by refusing her requests.  Thus, both Dr. Sazie and Raines are entitled to summary judgment as to this allegation.

Hepler does not specifically recall that Quesnoy requested a return of her walker while in DSU.  *Id*, p. 29.  However, as the DSU supervisor, he would have been notified of her requests pursuant to OAR 291-011-0060(5)(c), and, besides, calls from her family conveying this request precipitated his confrontation with her.  Hepler Depo. p. 25.  Despite this knowledge, he allegedly failed to ensure that she was provided with her personal health care items according to ODOC policy.  Thus, genuine issues of material fact exist as to Hepler's retaliatory actions in this regard.

### 3.  Hepler Confrontation

Quesnoy alleges that as a result of complaints by her and her family, Hepler berated her and chastised her for having her family members contact him to advocate on her behalf and made hurtful, personal comments about her marriage.  Hepler disagrees with Quesnoy's characterization of this event.  He states that he only spoke to Quesnoy about "the appropriateness of her husband calling the facility on her behalf" and discussed with her the appropriate ways to address her issues in the system, such as using kytes.  Hepler Depo., p. 25.

Hepler argues he was merely advancing a legitimate correctional goal by informing Quesnoy of the appropriate procedures.  However, if Hepler berated Quesnoy for complaining about her treatment to the point of causing her emotional distress, then he crossed the line from reasonably advancing a correctional goal to chilling her exercise of First Amendment rights.  Given the factual dispute between Quesnoy and Hepler as to what was said during their confrontation, summary judgment is denied as to this allegation.

### 4. <u>Disciplinary Sanctions</u>

Quesnoy alleges that as a result of her complaints, 20 days were added to her sentence and she was deprived from having physical contact with her family during visitations. Quesnoy's characterization of these sanctions as retaliatory is not supported by the record. They were not caused by Quesnoy's exercise of her rights, but by her violation of CCCF rules.

At CCCF, sanctions are established based on the nature of the rule violated. CCCF offers a hearing to determine if there is a violation and the appropriate sanction. The hearings officer uses the violation grid which dictates the appropriate sanction in the absence of special circumstances. Sturdevant Decl., ¶ 7. Sturdevant found Quesnoy violated Rule 1D(e) (Contraband) and Rule 4B (Disobedience of an Order II). Because her contraband violation was a Level 2 on the Major Violation Grid, Quesnoy was given the routine sanction which included 365 days of basic visitation.

In addition, a major disciplinary violation impacts the prisoner's release date. Quesnoy's sentence was determined by Washington County Circuit Court, but the ODOC system calculates her release date, which is the earliest possible date the inmate will be released and includes accumulated "good time" if the inmate has no disciplinary violations while in prison. *See* OAR 291-097-00225 ("The credits previously earned or applied will be retracted . . . (1) The inmate is found guilty of a major rule violation after a formal disciplinary hearing . . . and the disciplinary order directs that earned time credits earned or applied be forfeited in accordance with the Department's rule on Prohibited Inmate Conduct and Processing Actions.") Quesnoy's violation accordingly removed her "good time" of 20 days. This was not in retaliation, but simply an application of CCCF disciplinary policy.

19 - OPINION AND ORDER

Nonetheless, Quesnoy argues that Raines and Dr. Sazie failed to assist her from being disciplined for violating the rules because she exercised her First Amendment right.  Viewing the facts in favor of Quesnoy, Raines knew that she was taking a medication that may cause problems voiding and yet did not provide that information to either the hearings officer or to Drury who was seeking more information prior to the disciplinary hearing.  Oldham Decl., Ex. 4; Raines Depo., p. 39.  At that time, it is not clear whether Raines was aware of any complaints by Quesnoy or her family about her medical treatment.  However, after the hearing, Quesnoy's kytes to Superintendent Howton seeking an appeal of her hearing decision were referred to Raines who again did nothing.  Quesnoy Decl., Ex. F, p. 4.  Thus, a genuine issue of fact exists as to whether, due to Quesnoy's complaints, Raines refused to provide exculpatory information that would have avoided or reversed the disciplinary sanctions.  Due to a lack of evidence concerning any knowledge or involvement by Dr. Sazie or Hepler in this regard, they are granted summary judgment as to this allegation.

Quesnoy also argues that her limited visitation sanction is an adverse action in retaliation for her husband's protected activity.  A retaliatory act taken against a person because of the spouse's conduct violates the First Amendment right of intimate association.  *Adler v. Pataki*, 185, F3d 35, 44 (2nd Cir 1999).  To prove this claim, the plaintiff must establish that her association with her husband was a substantial or motivating factor for the adverse action.  *Gray v. Bruneau-Grand View Sch. Dist. No. 365*, No. CV-06-069-S-BLW,  2007 WL 1381785, at *2 (D Idaho March 27, 2007).

Quesnoy seems to rely on a violation of her right to intimate association because the end result was limited contact with her spouse.  However, she has presented no evidence to suggest

that her basic visitation sanction was imposed due to Raines' failure to provide exculpatory

evidence due to the complaints made by Quesnoy's husband.  As discussed above, there is no

evidence that Dr. Sazie was aware of these complaints or that Hepler had anything to do with the

disciplinary violation.  Thus, summary judgment is granted as to all three individual defendants

with respect to a violation of a right to intimate association.

### B.  Eighth Amendment (Second Claim)

Quesnoy alleges that she was subjected to unnecessary and wanton infliction of pain by

defendants because she was denied "appropriate medical care and discontinuation of medications

to manage pain," denied use of her walker and eyeglasses, and sanctioned with 20 days added to

her sentence without appropriate medical care.  Complaint, ¶ 38.

The Eighth Amendment requires prison officials to provide humane conditions of

confinement by ensuring that inmates receive adequate food, clothing, shelter, and medical care.

*Farmer v. Brennan*, 511 US 825, 832 (1994).  A prisoner claiming an Eighth Amendment

violation must establish, both objectively and subjectively, that particular conditions of

confinement are cruel and unusual.  *Wilson v. Seiter*, 501 US 294, 297-98 (1991).  To satisfy the

objective component, a plaintiff must allege a deprivation which objectively is "sufficiently

serious" to constitute an Eighth Amendment violation.  *Id* at 298.  To satisfy the subjective

component, a plaintiff must demonstrate that the prison official was "deliberately indifferent" to

a substantial risk of serious harm.  *Farmer*, 511 US at 834.  Deliberate indifference in this

context means that the official "knows of and disregards an excessive risk to inmate health or

safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he also must draw the inference."  *Id* at 837.

Because "a prison official's duty under the Eighth Amendment is to ensure 'reasonable safety," officials who respond reasonably are not liable. *Id*, at 844-45. In the context of medical needs, "an inadvertent failure to provide medical care cannot be said to constitute 'unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle v. Gamble*, 429 US 97, 105-06 (1976). Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.

In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. Only such indifference can offend "evolving standards of decency" in violation of the Eighth Amendment." *Estelle*, 429 US at 106. A mere "difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference." *Jackson v. McIntosh*, 90 F3d 330, 332 (9th Cir 1996) (citation and quotations omitted). Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Id* (citation omitted).

### 1. **Pain Medication**

Quesnoy asserts that changes in her pain medication resulted in cruel and unusual punishment. As discussed previously, Quesnoy was regularly seen by medical staff, but believed that her care was inadequate. The medical records indicate that changes were made in her pain medications over time and that an outside physician was consulted about her pain management.

Although she received different medical treatment before entering CCCF, Quesnoy has submitted no evidence that the medical treatment she received at CCCF was medically unacceptable and chosen in conscious disregard of an excessive risk to her health.

Quesnoy did have a serious reaction to Tramadol which rendered her unconscious because of its interaction with another drug.  However, there is no evidence that Dr. Sazie or Raines knew she would likely suffer an adverse reaction, and they immediately changed the medication when they learned of the problem.  The undisputed facts do not constitute deliberate indifference to Quesnoy's medical needs.

As discussed above, Hepler had nothing to do with the medications prescribed to Quesnoy.  Therefore, summary judgment is granted for all defendants as to this allegation.

## 2. **Personal Health Items**

In the DSU, Quesnoy was denied access to her walker and eyeglasses which she needs to function as a disabled person.[3]  Quesnoy Decl., ¶ 11.  Without a mobility device in her cell, she had to crawl to the end of her bed, grab the railing, and support herself to get to the toilet.  Quesnoy Depo., p. 61.  She was unable to get out of bed and move around in her cell and was denied recreation.  *Id*, pp. 106-07; Quesnoy Decl., ¶ 11.  As a result, she spent long periods lying in bed and developed bedsores.  Quesnoy Decl., ¶ 11.

Prison officials knew she wanted her walker and eyeglasses as she sent kytes requesting their return.  She also sent kytes after returning to general population, and her husband contacted CCCF staff and spoke with Hepler about her needs.  Quesnoy Decl., ¶ 11; Gary Quesnoy Decl.,

---

[3]  Quesnoy does not alleged denial of use of a pillow in support of her Second Claim.

¶¶ 4-6; Quesnoy Depo., pp. 102-05; 107-08.  As late as June 16, 2009, she did not have her walker.  Quesnoy Decl., Ex. B, pp. 8-9.

Defendants argue that Quesnoy's conditions in the DSU did not compromise her health or safety.  CCCF's records indicate that Quesnoy preferred mobility devices, but did not need them all the time.  She needed, and was provided, a wheelchair only for long distances.  Quesnoy Decl., Ex. A, pp. 1-11.  On March 21, 2009, she requested a walker "for short distances . . . to get around my room," but added that her doctors "encouraged [her] to walk" which she thought she could do "a little bit now."  *Id,* Ex. B, p. 16.  At that time, no walker was ordered due to a "high risk for falls."  *Id.*  Because she was able to move around at home without her walker by "table surfacing," Quesnoy Depo., p. 16, defendants maintain that she could similarly move about her DSU cell.  In fact, she made no complaints about being unable to use the toilet.

However, the record reveals that, despite asking for her walker repeatedly and rules allowing her to have it in the DSU, Quesnoy was denied its use.  Because of her limited mobility, she suffered from bedsores, a not insignificant medical condition.  This court cannot conclude at this point that Quesnoy voluntarily caused her bedsores and pain by lying in bed instead of moving about her cell by grabbing the rails and participating in recreation.

With respect to her eyeglasses, defendants point out that Quesnoy was able to write several kytes while in the DSU without having them.  Quesnoy Decl., Ex. C, pp. 1-11.  Being able to write is not the same as being able to read fine print and, viewing the facts in favor of Quesnoy, the deprivation of her eyeglasses adversely affected her ability to defend herself at the disciplinary hearing.  However, with respect to an Eighth Amendment claim, the lack of eyeglasses did not cause significant harm to her health or safety.

24 - OPINION AND ORDER

As discussed above, the record contains no evidence that Dr. Sazie or Raines have any responsibility for denying Quesnoy the use of her walker or eyeglasses in the DSU. Therefore, summary judgment is granted to them as to this allegation. However, genuine issues of fact exist as to an Eighth Amendment violation against Hepler based on his denial of the use of the walker.

### 3. **Disciplinary Sanctions**

As a result of her major disciplinary violation, Quesnoy lost her "good time" credits, resulting in 20 more days of incarceration, and an inability to have physical interaction during visitation. However, in those 20 additional days, Quesnoy was not deprived of humane conditions nor has she shown that conditions were imposed with deliberate indifference. Similarly, being given basic visitation is not a cruel deprivation. While she may object to the validity of the sanctions, as she has in other claims, she has not shown an Eighth Amendment violation as to her disciplinary sanction.

### C. **Fourteenth Amendment – Equal Protection (Third Claim)**

Quesnoy alleges that she was denied her right to equal protection because she was treated differently than other inmates due to her disabilities. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." C*ity of Cleburne v. Cleburne Living Ctr.*, 473 US 432, 439, (1985), citing *Plyler v. Doe*, 457 US 202, 216 (1982). To state a claim, "a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F3d 1193, 1194 (9th Cir 1998), *cert denied*, 525 US 1154 (1999). "Because 'the disabled do not constitute a suspect

class' for equal protection purposes, a governmental policy that purposefully treats the disabled differently from the non-disabled need only be 'rationally related to legitimate legislative goals' to pass constitutional muster." *Lee v. City of Los Angeles*, 250 F3d 668, 687 (2001), quoting *Does 1–5 v. Chandler*, 83 F3d 1150, 1155 (9th Cir 1996).

Quesnoy has not shown membership in a protected class so as to create a cognizable traditional, discriminatory equal protection claim. She merely argues that other disabled individuals received accommodations that she did not, such as more time to provide a urine sample. This appears to be an attempt to claim a state an equal protection claim under the class-of-one theory. *Engquist v. Or. Dep't of Agric.*, 478 F3d 985, 992 (2007), citing *Willowbrook v. Olech*, 528 US 562 (2000). A plaintiff properly pleads a class-of-one equal protection claim where the plaintiff "alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Willowbrook*, 528 US at 564.

Quesnoy may have a legitimate complaint that, based on her disabilities, she should have been accommodated by being listed on the medical status list for the purpose of providing a urine sample, provided her walker, eyeglasses and pillow in DSU, and provided better medications for her pain. However, simply claiming that other disabled inmates were treated differently, without submitting any evidence of who and how, does not equate to a showing sufficient to overcome summary judgment against an equal protection claim based on a class of one. Therefore, defendants are granted summary judgment against this claim.

///

///

26 - OPINION AND ORDER

### D.  Fourteenth Amendment – Substantive Due Process (Fourth Claim)

Quesnoy alleges she was denied her substantive due process rights under the Fourteenth Amendment when she was deliberately deprived of "medications, medical devices (including eyeglasses and a walker), therapy and treatment" and "of her liberty by adding an additional twenty days to her sentence."  Complaint, ¶¶ 54-55.

To a state a Fourteenth Amendment claim, a plaintiff must show that a person acting under the color of state law deprived the plaintiff of the "rights, privileges, or immunities secured by the Constitution and laws of the United States."  *Livadas v. Bradshaw*, 512 US 107, 132 (1994); *Giba v. Cook*, 232 F Supp2d 1171, 1179 (D Or 2002); 42 USC § 1983.  The substantive due process component of the Fourteenth Amendment protects against actions so arbitrary that they shock the conscience.  *County of Sacramento v. Lewis*, 503 US 833, 846-47, (1998); *see also Collins v. City of Harker Heights*, 503 US 115, 130 (1992).  Negligent action is insufficient to establish a violation of substantive due process.  *Davidson v. Cannon*, 474 US 344, 347 (1986); *Daniels v. Williams*, 474 US 327, 333 (1986).  A prisoner must allege a due process claim premised on the denial of a protected liberty interest that subjected him to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 US 472, 484 (1995) (finding that 30 days in prison segregation unit does not implicate a liberty interest); *Giba*, 232 F Supp2d at 1182 (2002).

With respect to Quesnoy being deprived of medications, the record reveals that she did receive pain medication, but not necessarily the ones she preferred, and was subjected to a period of withdrawal symptoms from opiates and of symptoms due to an adverse drug interaction. However, she was never deprived of pain medications.  Absent evidence that the medical

treatment Quesnoy received at CCCF was more than negligent and deliberately chosen to punish her, this portion of the claim fails.

Without her walker, Quesnoy asserts that she was unable to move about and ambulate while in the DSU, causing her to develop bedsores. Being denied basic mobility is an atypical and significant hardship. Therefore, this portion of the claim may proceed against Hepler, the only defendant involved in the denial of a mobility device to Quesnoy in the DSU.

As for the denial of her eyeglasses, Quesnoy has not shown this was so arbitrary as to shock the conscience. As previously noted, she was able to write kytes while in the DSU without her glasses. Quesnoy Decl., Ex. C., pp. 1-11. Summary judgment is granted as to this allegation.

Quesnoy also argues that losing her "good time" credits through a major disciplinary sanction constituted a constitutional deprivation. When a prisoner seeks damages under § 1983 that implies the validity of her conviction or sentence, she must also show "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Nonnette v. Small*, 316 F3d 872, 875 (9th Cir 2002), quoting *Heck v. Humphrey*, 512 US 477, 486-87 (1994). However, if there is no mechanism by which to invalidate the underlying conviction, a released inmate may proceed under § 1983. *Id* at 878. Accordingly, Quesnoy's due process claim, which implies the invalidity of her additional 20 day sentence, may proceed.

Substantive due process is satisfied in a prison disciplinary procedure if there is "some evidence" to show the inmate committed the offense in question. *Superintendent v. Hill*, 472 US

445, 455 (1985).  "Ascertaining whether this standard is satisfied does not require examination of

the entire record, independent assessment of the credibility of witnesses or weighing of the

evidence." *Id* at 455-56.  Rather, "the relevant question is whether there is any evidence in the

record that could support the conclusion reached by the disciplinary board."  *Id.*

Quesnoy lost her "good time" credits because she violated a rule and, as a result, received

the routine sanction.  At the hearing, she provided no evidence, but simply asserted she was

unable to urinate on demand because of a medical condition.  As previously discussed, there is

evidence that Raines knew Quesnoy's medication may cause problems voiding and yet did not

report it, interfering with Quesnoy's defense.  The record does not support any involvement by

Dr. Sazie or Hepler in this regard.  Based on a factual issue concerning the alleged refusal by

Raines to assist Quesnoy with her hearing and the resulting discipline, this allegation may

proceed as against Raines.

### E.  Qualified Immunity

As to each claim, defendants claim that they are entitled to qualified immunity.  The

doctrine of qualified immunity protects "government officials performing discretionary functions

. . . from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."  *Harlow v.*

*Fitzgerald*, 457 US 800, 818 (1982).  Therefore, public officials are generally immune from civil

liability unless their actions violate clearly established law because "a reasonably competent

public official should know the law governing his conduct."  *Id*.  "The qualified immunity

standard gives ample room for mistaken judgments by protecting all but the plainly incompetent

or those who knowingly violate the law." *Hunter v. Bryant*, 502 US 224, 229 (1991) (citation and internal quotations omitted).

The qualified immunity inquiry has traditionally involved two prongs. First, the court must decide whether the plaintiff has shown that a constitutional or statutory right has been violated. *Saucier v. Katz*, 533 US 194, 201 (2001). If the first step is satisfied, the court must then decide whether the right at issue was "clearly established" at the time of the alleged violation. *Id*. However, the Supreme Court recently held that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 US 223, ___ , 129 S Ct 808, 818 (2009).

Quesnoy has submitted sufficient evidence to create a fact issue as to whether a constitutional right was violated as to: (1) portions of the First Amendment retaliation claim (First Claim) regarding the change in Quesnoy's pain medication by Dr. Sazie and Raines, the denial of medical and mobility devices in the DSU and the confrontation with Quesnoy by Hepler, and the refusal by Raines to provide information that would remove the disciplinary sanction; (2) the Eighth Amendment Claim (Second Claim) as to Hepler's denial of her mobility device; and (3) the Fourteenth Amendment Substantive Due Process Claim (Fourth Claim) as to the denial of her mobility devices in the DSU by Hepler and the refusal by Raines to provide information that would remove the disciplinary sanction. All of these rights were clearly established at the time of the alleged constitutional violations. Thus, defendants do not have qualified immunity as to the remaining constitutional claims.

///

## <u>ORDER</u>

Plaintiff's Motion for Partial Summary Judgment (docket # 28) is DENIED.

Defendants' Motion for Summary Judgment (docket # 29) is GRANTED in part as follows:

1. First Amendment retaliation claim (First Claim) as to:

    a. Hepler for denying appropriate medical care and access to medications to manage pain, changing pain medication, refusing to remove the additional 20 days from the sentence, and depriving her from physical contact with her family;

    b. Raines for causing an adverse drug reaction, denying use of a walker, eyeglasses and pillow in the DSU, and depriving her from physical contact with her family;

    c. Dr. Sazie for causing an adverse drug reaction, denying use of a walker, eyeglasses and pillow in the DSU, depriving her from physical contact with her family, and refusing to remove the additional 20 days from her sentence;

2. Eighth Amendment claim (Second Claim) as to:

    a. Hepler for denying appropriate medical care and discontinuing pain medications, denying the use of eyeglasses in the DSU, and adding 20 days to her sentence without appropriate medical care;

    b. Raines and Dr. Sazie for denying appropriate medical care and discontinuing her pain medications, denying use of a walker and eyeglasses in the DSU, and adding 20 days to her sentence without appropriate medical care;

3. Fourteenth Amendment Equal Protection Claim (Third Claim);

31 - OPINION AND ORDER

4. Fourteenth Amendment Substantive Due Process Claim (Fourth Claim) as to:

    a. Hepler for depriving her of medications, therapy and treatment and failing to remove the additional 20 days to her sentence;

    b. Raines for depriving her of medications, medical devices (including her walker and eyeglasses), therapy and treatment;

    c. Dr. Sazie for all allegations;

5. Intentional Infliction of Emotional Distress Claim (Seventh Claim);

and is otherwise DENIED.

Thus, the claims remaining for trial are:

1. First Amendment retaliation claim (First Claim) as to:

    a. Hepler as to denial of use of a walker, eyeglasses, and pillow in the DSU and his confrontation with Quesnoy;

    b. Raines as to denying appropriate medical care by failing to allow her access to appropriate pain medications and refusing to provide information that would support the removal of the additional 20 days from her sentence;

    c. Dr. Sazie as to denying appropriate medical care by failing to allow her access to appropriate pain medications;

2. Eighth Amendment claim (Second Claim) as to Hepler for denying use of a walker in the DSU;

3. Fourteenth Amendment Substantive Due Process Claim (Fourth Claim) as to:

    a. Hepler for denying use of walker in the DSU;

      b.  Raines for refusing to provide information that would support the removal of

20 days from Quesnoy's sentence; and

   4.  ADA and ORS 659A.142 disability discrimination act claims (Fifth and Sixth

Claims).

    DATED this 4th day of November, 2011.

                                  s/ Janice M. Stewart_____
                                  Janice M. Stewart
                                  United States Magistrate Judge